IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CYNTHIA G. COOK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | CIVIL ACTION |
| v. ) | |
| ) | No. 11-2184-KHV |
| **UNIVERSITY OF KANSAS and** ) | |
| **OLA FAUCHER,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

**MEMORANDUM AND ORDER**

Cynthia Cook brings suit against Ola Faucher, in her capacity as the Director of Human Resources/Equal Opportunity at the University of Kansas, for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634. Plaintiff asserts that because of her age, the University did not hire her as an Information Specialist I.[1] Defendant argues that the University did not select plaintiff for the position because other candidates possessed the best combination of supervisory and technical skills, and denies discriminatory intent. This matter comes before the Court on (1) Defendant Ola Faucher's Motion For Summary Judgment (Doc. #45) filed June

---

[1] In Plaintiff's Memorandum In Opposition To Motion For Summary Judgment, plaintiff contends that because of her age, she was laid off from her position as an Information Specialist and then not hired as an Information Specialist I. (Doc. #53) filed July 20, 2012 at 1. The Pretrial Order states plaintiff's theory of recovery as follows: "Plaintiff asserts that she is entitled to relief upon the single theory of a violation of the Age Discrimination in Employment Act, specifically that she was not selected for the position of Information Specialist I – Help Desk Team Lead based on her age." (Doc. #42) filed June 11, 2012 at 6. Plaintiff has thus waived any claim for relief for alleged age discrimination resulting from a lay-off. Moreover, the amended complaint does not include a request for relief based on a lay-off, and plaintiff does not make any further mention of it in her opposition to defendant's summary judgment motion.

22, 2012,[2] and (2) <u>Plaintiff's Motion For Leave To File A Surreply Memorandum In Opposition To Defendant's Motion For Summary Judgment</u> (Doc. #57) filed August 20, 2012.  As a preliminary matter, the Court sustains plaintiff's motion for leave to file a surreply.  For the following reasons, the Court sustains defendant's motion.

## **Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A "genuine" factual dispute is one "on which the jury could reasonably find for the plaintiff," and requires more than a mere scintilla of evidence.  <u>Liberty Lobby</u>, 477 U.S. at 252.  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  <u>Id.</u> at 248.

The moving party bears the initial burden of showing that there are no genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Justice v. Crown Cork & Seal Co.</u>, 527 F.3d 1080, 1085 (10th Cir. 2008).  Once the moving party meets its burden, the burden shifts to the nonmoving party to show that a genuine issue remains for trial with respect to the dispositive matters for which she carries the burden of proof.  <u>Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.</u>, 358 F.3d 736, 739 (10th Cir. 2004); <u>see</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

---

[2]  Plaintiff's original complaint brought suit against Faucher and the University of Kansas.  <u>Complaint</u> (Doc. #1) filed March 29, 2011.  Her amended complaint names only Faucher.  <u>Amended Complaint</u> (Doc. #10) filed May 23, 2011.  On defendant's <u>Motion To Dismiss</u> (Doc. #13) filed on June 6, 2011, the Court  dismissed plaintiff's due process claim (Count II).  <u>Memorandum and Order</u> (Doc. #25) filed December 6, 2011.

As to these matters, the nonmoving party may not rest on her pleadings but must set forth specific facts. Fed. R. Civ. P. 56(e)(2); Matsushita, 475 U.S. at 586-87; Justice, 527 F.3d at 1085. Conclusory allegations not supported by evidence are insufficient to establish a genuine issue of material fact. Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007); see Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996).

When applying this standard, the Court must view the factual record in the light most favorable to the party opposing the motion for summary judgment. Duvall v. Ga.-Pac. Consumer Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010); see Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

**Facts**

The following facts are stipulated, uncontroverted, deemed admitted or construed in the light most favorable to plaintiff.

The University of Kansas hired plaintiff in June of 1980 as a Secretary I. Plaintiff later moved to the Customer Service Center, and as of January of 2009 plaintiff held a Technology Support Tech Senior position in the Information Technology Department. Her position had the working title of "Information Specialist – Customer Service Center (CSC)."

In the fall of 2008, the University created a committee to begin developing a new structure for the CSC. Ann Ermey, the Director of Service Management and Delivery in the University's Information Technology ("IT") department, chaired the committee, which included other IT Department staff and

personnel from elsewhere on campus. The committee began by looking at results from a survey of campus perception of the CSC and examining other university models. On January 9, 2009, at the conclusion of the review, three IT directors finalized a proposal for a new CSC that outlined specific tactical steps and cost savings as a first step toward building a better CSC. The proposal noted issues and limitations with the CSC as it had been operating, including a lack of defined tiers of support and system services,[3] a lack of technical knowledge standards or certifications for staff and the continued use of a "best effort" approach to answering questions on the telephone.

On January 14, 2009, defendant signed letters notifying plaintiff and six other full-time support staff employees at the CSC that the University planned to lay them off effective June 30.[4] The letters stated that the University was eliminating their positions due to reorganization needs within the CSC. Consistent with those letters, IT Director Judy Loats informed the IT staff in an email message dated January 22, that the CSC would be taking a new direction and that seven staff positions would be eliminated as of June 30. On June 18, however, defendant sent plaintiff and fellow employee Kim Trader another letter informing them that their layoff dates were being extended from June 30 to August 31 because "the customer service area still has a need for your expertise in providing assistance to users while the reorganization is being finalized." Doc. #46-16 at 2. Plaintiff knew of and had agreed to the extension.

As part of the reorganization, the University announced the new position of Information

---

[3] "Tiers" in the CSC/Help Desk are generally levels of escalation to resolve customers' problems, with zero being self-help; Tier 1 offering the most simple and immediate answers; and Tier 3 being the highest level for the most complicated issues.

[4] The other six employees were David Bobbitt, Diana Hazelbeck, Kathy Horton, Ryan Papesh, Tracy Scott-Gleason and Kim Trader.

Specialist I – Help Desk Team Lead.  The announcement of the position included the following:

> Position Overview
> This position in the KU Information Technology Customer Service Center works as a Team Lead responsible for supervising, training, and mentoring student representatives as well as actively participating in receiving, prioritizing, documenting, and resolving customer issues and requests.  The successful candidate will utilize a broad range of technical skills and knowledge as well as highly developed customer service and communication skills to troubleshoot and resolve questions surrounding IT and desktop services/applications.  Customer contact includes phone, email, chat, and less frequent in-person interactions serving faculty, staff, and students.  Internally, this position interacts frequently with Tier 2 and Tier 3 technical staff to collaborate on issues and resolution.

Doc. #46-7 at 2.  The announcement indicated that a Team Lead would spend 60% of his or her time processing, troubleshooting and resolving Tier 1 technical issues; 20% creating technical documentation for the IT knowledge base and actively participating in process/service quality improvement measures; 15% supervising, training and mentoring CSC student staff including performance and quality service monitoring; and 5% in meetings and other duties.  Id. at 3-4.[5]  While defendant asserts that the new Team Lead position had different duties than plaintiff's prior positions (including resolving technical issues, preparing technical documents and putting them in the knowledge base, and supervising, training and mentoring student staff), plaintiff contends that the new position had the same duties which she performed as an Information Specialist.  Plaintiff concedes, however, that the duties and qualifications had been "tweaked a bit," and were different in some areas.  Cook Depo. at 10.

On or about July 6, 2009, plaintiff applied for the Team Lead position.  Ninety-five other people also submitted applications.  The University selected only seven applicants to interview, and plaintiff

---

[5] The parties disagree whether the Team Lead position was a Tier 1 position (as plaintiff asserts) or a Tier 1/Tier 2 position (as defendant states).  The Court finds that the categorization is not material to this motion.

was among them.[6] The selection committee was composed of Ann Ermey, Heather Coffman, Marianne Reed and David Yarnevich. Lawanna Huslig also sat in on the interviews.[7] Plaintiff knew all of the interviewers and had not had negative interactions with any. The committee members developed a common set of questions which they posed to all the candidates. Plaintiff interviewed on August 18, and the committee completed its first round of interviews within three days.

Plaintiff did not think that she should have had to sit for an interview, and she was extremely nervous during it. She admits that her interview "could have gone a lot better," and that she did not do her best. Question 10 on the committee's list asked the candidates to "[t]ell us about a time when you had to intervene when a fellow employee was providing poor customer service or inappropriate information." When the committee posed that question to plaintiff, she answered that she would "stand up, wave my arms, and start yelling." She later admitted that "probably wasn't the best answer." In answer to another question, which asked what the candidate would do if a caller complained about not being able to get on line, plaintiff responded that she would ask what the user was trying to do; that it could mean a lot of things; and that she would start from the beginning and take it from there.

The committee conferred after completing the interviews and unanimously agreed to recommend Lindsay Armstrong, Brett Gerstenberger and Kim Trader for the Team Lead position.[8] All three are younger than plaintiff. During their discussion, no committee member spoke of any candidate's age.

---

[6] Although the committee invited seven applicants to interview, one declined.

[7] Ann Ermey was plaintiff's supervisor. Heather Coffman was the newly-hired CSC Manager. Marianne Reed was Manager of Constituent Services. David Yarnevich was an IT Network Specialist. Lawanna Huslig was a Human Resources assistant in the IT department.

[8] Plaintiff has submitted her own affidavit stating that on her last day of work, Heather Coffman told plaintiff that she had voted for her for Team Lead. Doc. #54-1 at 2. The Court addresses this affidavit in Section III, infra.

They did, however, discuss the quality of the candidates' answers to interview questions and the skills and experiences they demonstrated in their application materials and interviews.  Based on those considerations, the committee members agreed that of the six people who interviewed, Armstrong, Gerstenberger and Trader were clearly better candidates than the other three.  Although the reorganization proposal had contemplated that two individuals would be hired as Team Leads, the committee felt that it had three really strong candidates and recommended that the University hire all three. Ermey made the recommendation to IT Director Loats on the committee's behalf, and following a second round of interviews, the University offered positions to all three and all accepted.

On or about August 21, plaintiff learned that the committee had not chosen her for a second interview.  With that, and consistent with the layoff notice informing her that her position was being eliminated, plaintiff's employment with the University ended on August 31, 2009.

## **Analysis**

Plaintiff argues that defendant, in her official capacity, failed to hire plaintiff for a Team Lead position because of age.  Plaintiff may establish that defendant acted with discriminatory intent under the ADEA[9] either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 824 (1973).  See Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1278-79 (10th Cir. 2010).[10]  Plaintiff relies

---

[9] The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

[10] In Jones, the Tenth Circuit considered whether the McDonnell Douglas framework applied to ADEA claims after the Supreme Court decision in Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).  It held that "Gross does not preclude our continued application of McDonnell Douglas to ADEA claims." Jones, 617 F.3d at 1278.

-7-

on the indirect method of proving discrimination. See Plaintiff's Memorandum In Opposition (Doc. #53) at 10. Under the McDonnell Douglas burden-shifting framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008) (quoting Sanchez v. Denver Pub. Sch., 164 F.3d 527, 531 (10th Cir. 1998)). If plaintiff satisfies her burden, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802-03; Sanders, 544 F.3d at 1105 (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)). If defendant does so, the burden shifts back to plaintiff to show a genuine issue of material fact whether defendant's stated reason is pretextual, i.e. unworthy of belief. Sanders, 544 F.3d at 1105. If plaintiff so shows, she gets over the hurdle of summary judgment. Id. (quoting Morgan, 108 F.3d at 1323).

To establish a prima facie case of age discrimination under the ADEA, plaintiff must show that (1) she is a member of the class protected by the ADEA; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) defendant treated her less favorably than others not in the protected class. See Jones, 617 F.3d at 1279. Defendant concedes that plaintiff has established a prima facie case. Defendant Ola Faucher's Memorandum In Support Of Motion For Summary Judgment (Doc. #46) at 24. Even though plaintiff has established a prima facie case of age discrimination, defendant argues that she has not established a genuine issue of material fact whether defendant's nondiscriminatory reason for failing to hire her is pretextual, i.e. not the real reason that defendant hired others instead of her for the Team Lead position. Here, defendant asserts that plaintiff was not hired because of an interview response that caused committee members concern about her approach to supervising students and because other candidates had better technical and supervisory

skills.  See Pretrial Order (Doc. #42) at 6.

Plaintiff concedes that defendant has proffered a legitimate, nondiscriminatory reason why she was not offered a Team Lead position.  Plaintiff's Memorandum In Opposition (Doc. #53) at 10.  To survive summary judgment, plaintiff must establish a genuine issue of material fact whether defendant's reason is a pretext for age discrimination.  See McDonnell Douglas, 411 U.S. at 802-03; Sanders, 544 F.3d at 1105.  And to establish pretext, plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005).  In other words, she must produce evidence "that something more nefarious might be at play," not just that defendant "got it wrong."  Johnson, 594 F.3d at 1211.

Plaintiff asserts that three pieces of circumstantial evidence raise disputed factual issues as to pretext: (1) the committee's use of subjective criteria in determining that plaintiff's response to an interview question was of concern; (2) disturbing procedural irregularities in that the University failed to follow its own layoff policy; and (3) seven false explanations that the University gave for its actions.  Plaintiff's entire argument spans three pages.  The Court will address each piece of circumstantial evidence in turn.

**I.     Subjective Criteria**

Plaintiff contends that the selection committee used subjective criteria to determine that her answer to Question 10 was "deeply concerning" and a "red flag."  The basis for her contention is that Heather Coffman, her immediate supervisor, did not find her answer so troubling that it prevented Coffman from voting to hire her as a Team Lead.  Plaintiff's argument totals three sentences and she

offers no legal authority to support it.

While the subjective nature of evaluations may be a factor to consider, it ordinarily is not by itself sufficient to establish pretext. Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1195 (10th Cir. 2006). Plaintiff's argument is without merit for the following reasons:

> [E]vidence of pretext may include the use of subjective criteria. Although subjective considerations are not unlawful per se, obviously subjective decision making provides an opportunity for unlawful discrimination. [Plaintiff] argues that the promotion process at issue here provided just such an outlet for discrimination. She claims the panelists applied no selection criteria "against which candidates can be measured," resulting in a "selection process based upon much more subjective and amorphous standards, known and fathomable only to the decision maker." While there is certainly a level of subjectivity in any interview-based selection process, [plaintiff] provides no evidence that the interviewers used their discretion as a means for unlawful discrimination. The panelists asked every applicant the same three questions and then ranked the candidates based on their responses. [Plaintiff] never discredits the [employer]'s explanation that she was not ranked highly, and therefore not selected, because she did not answer the questions completely. The interviewers thought, and [plaintiff] agreed, that she did not present herself as a strong candidate . . . . In sum, [plaintiff] has failed to raise a genuine doubt about Defendant's motivation, or produce evidence refuting or showing that the [employer's] stated reasons for not promoting her were implausible, inconsistent, or unworthy of credence. Thus, summary judgment was proper.

Santana v. City & Cnty. of Denver, 488 F.3d 860, 866 (10th Cir. 2007) (internal quotations and citations omitted). Here, the selection committee asked the same questions of all six candidates. Plaintiff admits that her interview did not go well, and she does not defend the answer she gave to Question 10 or suggest that the committee should not have accorded it significance. Putting aside Coffman's vote, plaintiff does not dispute that at least three of the four committee members concluded that plaintiff's interview and qualifications did not rank her as highly as Armstrong, Gerstenberger and Trader. Plaintiff has presented no evidence that the committee used its discretion as a means for unlawful discrimination.

## II.     **Procedural Irregularities**

-10-

Plaintiff asserts that she has presented circumstantial evidence of pretext by showing "disturbing procedural irregularities" in that the University failed to follow its own layoff policy, which through a series of connections resulted in her not being selected for a Team Lead position. As noted in footnote 1, supra, the pretrial order contains no mention of the university's layoff policy and plaintiff is not seeking recovery on any theory that includes such policy. Accordingly, evidence of the university's adherence to the policy is irrelevant. Even if it were relevant, however, plaintiff's argument fails.

The Tenth Circuit recognizes that "disturbing procedural irregularities," including "deviations from normal company procedure," can support a plaintiff's assertion of pretext. Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1219-20 (10th Cir. 2002). Plaintiff must be able to show that there was such a policy and that similarly situated employees were treated differently than she was.[11] See Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 1003 (10th Cir. 2011). Although plaintiff cites two Tenth Circuit cases for the proposition that circumstantial evidence of disturbing procedural irregularities may indicate pretext, she does not explain how the cases apply to her situation and this Court concludes that they do not. See Trujillo v. Pacificorp, 524 F.3d 1149, 1158-59 (10th Cir. 2008) (company failure to follow security procedures in accusing plaintiff of theft raised inference of discrimination); Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1138 (10th Cir. 2003) (evidence of altered files and treating plaintiff differently than other employees with mental problems permitted reasonable inference that plaintiff's supervisors acted with ulterior motive and manufactured proffered reasons for terminating employment).

---

[11] In her surreply, plaintiff argues that defendant misses the point by arguing that plaintiff has failed to show that she was treated differently than other University employees under the layoff policy. Defendant's argument addresses whether plaintiff has presented evidence that she was treated differently than other similarly situated employees, which plaintiff must show if she is to successfully demonstrate that her termination involved disturbing procedural irregularities.

Moreover, as defendant points out, the University's layoff policy became effective on January 30, 2009, after plaintiff had received her lay-off notice. Even if the policy had been in effect, plaintiff provides no evidence that the University violated it or that hiring individuals for the Team Lead position implicated the policy in any manner. Plaintiff asserts that defendant approved laying off only three of the seven staff positions at the CSC, and that plaintiff would have been one of the four retained employees because of her longevity. Plaintiff provides no evidence that the University did not authorize the department-wide layoffs as part of the reorganization. Nor is there evidence to support plaintiff's argument that she could have been "retained" for a newly-created Team Lead position. Plaintiff has not provided record evidence of procedural irregularities which suggest pretext.

### III.    False Explanations

Plaintiff argues that the record contains circumstantial evidence of pretext consisting of false explanations for not hiring her, and that a fact finder could reasonably infer a wrongful motive from the falsity. Plaintiff cites Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000), in support of her assertion that circumstantial evidence can prove wrongful motive. In one sentence apiece, plaintiff then lists seven allegedly false University explanations. Most, however, are not explanations for why the University did not hire plaintiff as a Team Lead, which is the only employer explanation relevant to pretext. Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1230 (10th Cir. 2000) (one of three ways to show pretext is evidence that stated reason for adverse employment action was false). Thus, the Court need not examine the truth of the following statements: (1) that the focus or goal of the CSC was different before the reorganization in 2009; (2) that under the 2009 reorganization proposal, the Team Lead position was expected to function as a Tier 2 position; (3) that in January of 2009, defendant approved the layoff of the entire CSC staff; (4) that the new Team Lead position had different

duties than plaintiff's prior position as an Information Specialist; and (5) that a broad range of technical skills, including field tech experience, was a required or preferred qualification for the new Team Lead position. These statements are not explanations; they are facts with which plaintiff takes issue, but they are not necessarily material because the University did not advance them as reasons why plaintiff did not get a Team Lead position. Moreover, these facts are not material insofar as they concern plaintiff's qualifications. Defendant concedes that plaintiff has established a prima facie case so, *ipso facto*, defendant admits that plaintiff was qualified to be a Team Lead.

Two allegedly false explanations remain. The first is that the three individuals hired as Team Leads had experience with system administration, programming or closely related information, whereas plaintiff lacked that preferred qualification. Plaintiff has not demonstrated, however, that this statement is false. Plaintiff does not dispute the qualifications or experience of the three successful candidates. Instead, plaintiff points to screening sheets that Coffman and Reed prepared before the interviews, noting that both women checked "yes" on plaintiff's sheet for the preferred qualification of "experience with system administration, programming or closely related information technology experience." Docs. #54-7, 54-8.[12] The two interviewers left blank that preferred qualification on their sheets for

---

[12] The credibility of these screening sheets is suspect, given the following excerpt from plaintiff's deposition:

> A: I just looked at the position [announcement] and the [Team Lead] position is pretty much the same job that we were all laid off from with the exception of a little tweaking, preferred qualification, ["]experience with system administration, programming or closely related information technology experience.["] I did not have that.
> ***
> Q: [Y]ou did not have any system administration experience?
>
> A: No.

(continued...)

Armstrong, Gerstenberger and Trader, checking neither "yes" nor "no."

The last false explanation that plaintiff posits is that no member of the selection committee supported her for one of the Team Lead positions. She points to her own affidavit, which she submitted along with her response to defendant's motion to dismiss, and which states the following: "On my last day of work, Heather Coffman told me, 'if it is any consolation, I voted for you for Team Lead, and I would be happy to give you a good reference.'" Cook Decl. ¶4. Defendant argues that plaintiff's affidavit – which contradicts her deposition testimony and every other bit of evidence on this issue – is a sham that the Court should ignore. Plaintiff correctly asserts that the Court is not free to disregard her affidavit simply because it conflicts with her prior sworn statement. Martinez v. Barnhart, 177 Fed. Appx. 796, 800 (10th Cir. 2006). Such evidence may be disregarded, however, when it is merely an attempt to create a sham fact issue. Id. Factors relevant to the existence of a sham fact issue include whether plaintiff was cross-examined during her earlier testimony, whether she had access to the pertinent evidence at the time of her earlier testimony or the affidavit is based on newly discovered evidence and whether her earlier testimony reflects confusion which the affidavit attempts to explain. Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).

Plaintiff's affidavit stands as a dramatic contrast to her pleadings and her deposition testimony.

---

[12](...continued)
Q: You did not have any programming experience?

A: No.

Q: And you did not have any closely related information technology experience?

A: I'm not sure what they meant by that. . . . I'm assuming it's the same area as programming. No.

Doc. #46-3 at 9-10.

-14-

In her complaint, plaintiff alleges that, "based on Ms. Coffman's recommendations, all three of the other, younger candidates were selected to fill a Team Lead position, but Ms. Cook was not selected." (Doc. #1) ¶14.  Plaintiff repeated the same statement in her amended complaint. (Doc.) #10 ¶15.  In her deposition, plaintiff denied having personal knowledge that Coffman had made any recommendations for filling the Team Lead position.  (Doc. #56-1) at 3-4.  Even more specifically, plaintiff testified as follows:

> Q: But we talked earlier and in fact your last day actually on the job was Friday, August 28th, correct?
>
> A:  Yes.
>
> \* \* \*
>
> Q:  It makes reference there to Ms. Coffman calling you in her office; is that correct?
>
> A:  Yes.
>
> Q:  Do you remember that conversation?
>
> A:  Yes, I do.
>
> Q:  And what do you remember about that conversation with Ms. Coffman on August 28th, 2009?
>
> A:  She had – she said, I did not know you had been here for so many years, and I want you to know even though I only worked with you for five or six weeks, that I'll give you a good recommendation.
>
> Q:  Anything else she said during that conversation?
>
> A:  Not that I recall.

Id. at 6-7.

Plaintiff's changed story does not result from newly discovered evidence.  She testified both generally and specifically about Coffman, and the deposition transcript contains no hint of confusion. See Franks, 796 F.2d at 1237.  The Court thus concludes that plaintiff's affidavit about Coffman is a

sham. The Court will disregard it and exercise its discretion under Fed. R. Civ. P. 56(e) to consider as uncontroverted defendant's assertion that no interviewer suggested that plaintiff be placed in a Team Lead position. See Peterson v. Garmin Int'l, Inc., 833 F. Supp. 2d 1299, 1306 (D. Kan. 2011); Coleman v. Blue Cross Blue Shield of Kan., 487 F. Supp. 2d 1225, 1237-38 (D. Kan. 2007). Plaintiff has not demonstrated pretext through circumstantial evidence of false explanations.

**IT IS THEREFORE ORDERED** that Defendant Ola Faucher's Motion For Summary Judgment (Doc. #45) filed June 22, 2012, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Leave To File A Surreply Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #57) filed August 20, 2012, be and hereby is **SUSTAINED.**

Dated this 4th day of October, 2012 at Kansas City, Kansas.

             s/ Kathryn H. Vratil
             KATHRYN H. VRATIL
             United States District Judge